IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRISTOPHER GEORGE KNOX                                        PLAINTIFF

      v.                                 Civil No.  15-5006

NURSE RHONDA BRADLEY, Southern
Health Partners; SOUTHERN HEALTH
PARTNERS; DR. ROBERTO SAEZ; and
NURSE TERESA LEE                                               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

The events that are the subject of this suit occurred while Plaintiff was incarcerated in

the Washington County Detention Center (WCDC) in Fayetteville, Arkansas.  Specifically,

Plaintiff maintains his rights were violated in the following ways:  (1) he was denied adequate

medical care or his medical care was delayed; and (2) his mental health medications were

changed.

A summary judgment motion (Doc. 83) was filed on behalf of Nurse Bradley, Southern

Health Partners (SHP), Dr. Saez, and Nurse Lee.  On April 19, 2016, a hearing was held to allow

the Plaintiff to orally respond to the summary judgment motions.[1]

### I.  Summary Judgment Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[1] At the summary judgment hearing, Plaintiff dismissed all claims against Sergeant Freeman and Nurse Kristin Jones.  By motion (Doc. 107), Plaintiff subsequently dismissed all claims against Sheriff Tim Helder and Major Randall Denzer.  The summary judgment motion (Doc. 86) filed on their behalf was therefore moot.

AO72A
(Rev. 8/82)

R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  <u>RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.</u>, 49 F.3d 399, 401 (8th Cir. 1995).

The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  <u>See McCleary v. ReliaStar Life Ins. Co.</u>, 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## II.  Background and Evidence Presented

Plaintiff was booked into the WCDC on November 5, 2014, and remained there until his transfer to the Arkansas Department of Correction (ADC) on March 2, 2015.  *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 1 at 1.  He testified he was there because of a parole violation and could not bond out.

Plaintiff testified that before he was booked in he had been diagnosed with:  borderline personality disorder; bipolar disorder; post traumatic stress disorder; panic disorder;

-2-

hypertension; and degenerative joint disease.  *Plff's Ex.* 3 at 25-26.[2]  He reported being on the following medications: Lisinopril, Alprazolam, Paxil, Latuda, Abilify, Temazepam, and Hydrocodone.  *Plff's Ex.* 1 at 3.  Plaintiff testified that these medications, with the exception of hydrocodone, had been prescribed by Advanced Practice Nurse (APN) Debbie Koch at Perspectives Behavioral Health (Perspectives).  Plaintiff indicated the Hydrocodone had been prescribed by a doctor at Washington Regional Medical Center (WRMC).  Plaintiff testified that when he was booked into the jail, he had current prescriptions for these medications. He did not, however, have the medications with him.  Plaintiff testified that he had been hospitalized two or three times when he had suicidal thoughts and exhibited some psychosis.

Plaintiff testified that from May 2014, up until his incarceration on November 5, 2014, he was undergoing active treatment at Perspectives.  He indicated that he was seeing a psychiatrist every two months and a therapist once a month.

Plaintiff testified he saw a nurse on November 6, 2014, the day after he was booked in. Plaintiff indicated he explained his diagnoses and the medications he was taking.  Plaintiff was told he would be referred to a psychiatric nurse.  He was not given his prescribed medications. Plaintiff testified he could not get out of bed for a week because he was suffering withdrawal symptoms.  As a result of the abrupt discontinuation of his medications, Plaintiff testified he was sweating, having nightmares, not eating, experienced vomiting and diarrhea, and was confused. Plaintiff stated he was incoherent much of this time and could not submit requests or grievances. Plaintiff indicated he had been on some of these medications for years.

---

[2]Page references for this exhibit are located in the right upper corner of each page.

Plaintiff called and had his family bring his medications from home.   *Plff's Ex.* 1 at 6. The medication was delivered to the detention center on November 8, 2014.   *Id.*   Plaintiff testified the following medications were refused because they were narcotics: Alprazolam, Temazepam, Hydrocodone, and Tramadol.   The jail kept the Latuda, Lisinopril, and Paxil.   *Id.; see also Defts' Ex.* 1-b.   Plaintiff testified he started getting these medications on November 10, 2014.   *See also Defts' Ex.* 2 at ¶¶ 4-5.   Latuda is an anti-psychotic medication.   *Id.* at ¶ 8. Lisinopril is used to treat high blood pressure.[3]   Paxil is an anti-depressant and anti-anxiety medication.   *Id.* at ¶ 6.

Thus, Plaintiff was without any medication from November 5th to November 10th. Plaintiff testified that even after he starting receiving the medications the detention center kept, he continued to suffer from withdrawal from the other medications.

On November 13, 2014, Plaintiff submitted a request to see the psychiatric nurse.[4]   Doc. 88-4 at 1.   By November 13th, Plaintiff indicated he was starting to feel better.

Plaintiff testified he was first seen by Nurse Madewell on November 19, 2014.   Plaintiff indicates she explained what her job was and how the system worked.   Plaintiff complained his stomach was hurting and that he believed this was a side effect of Latuda.   He testified that the directions for Latuda said it should be taken on a full stomach.   However, because of the meal and medication distribution times, this did not occur.   Plaintiff was given a prescription for Prilosec.   *Plff's Ex.* 1 at 14.   Nurse Madewell put the medication on the medication cart and made

---

[3]https://medlineplus.gov/druginfo/meds/a692051.html (accessed November 10, 2016).

[4]This exhibit was submitted by the Washington County Defendants with their summary judgment motion and was admitted into evidence during the summary judgment hearing.   As they have now been dismissed from this case, the Court will refer to the CM/ECF document number and page number rather than the exhibit number.

out a medication administration record (MAR). *Id.* Plaintiff testified that Nurse Madewell said

she would ask the doctor about the medications that were refused. *Id.* Plaintiff indicated he had

been in jail several other times and he knew that you just had to wait it out.

That same day, Plaintiff submitted a medical request asking to be placed on the doctor's

list so they could discuss alternatives to the medication he had been refused because of jail

policy. Doc. 88-4 at 3. On November 21, 2014, Nurse Bradley responded that he was on the list

to see the psychiatric nurse. *Id.*

On November 21, 2014, Plaintiff submitted a medical request indicating that he had a

sore throat and cough and also needed to see the doctor about his medication. Doc. 88-4 at 3.

In response, he was added to the nurse call. *Id.* Plaintiff testified he did talk to the nurse but he

wanted to speak to the doctor. According to the Plaintiff, Nurse Bradley told him that if he saw

the doctor, he would be taken off all of the medications.

On November 24, 2014, Dr. Saez ordered the Latuda to be administered at evening pill

call. *Defts' Ex.* 2 at ¶ 11. On November 29, 2014, Dr. Saez prescribed Motrin 800 mg. for ten

days to treat Plaintiff's back pain. *Id.* at ¶ 25. Motrin is a non-steroidal anti-inflammatory pain

reliever. *Id.* at ¶ 23.

Plaintiff testified that he saw Dr. Saez on December 5, 2014. Plaintiff testified that he

asked about alternatives to the narcotic medications he was being denied. Plaintiff indicates he

also asked for something to treat anxiety. Plaintiff complained of excessive sleepiness and

fatigue as a result of taking Latuda in the morning. Because of the jail's routine, Plaintiff was

not able to lay down after having taken the medication. *Plff's Ex.* 1 at 14. Plaintiff testified that

Nurse Madewell had suggested he discontinue the Latuda.

-5-

Plaintiff was started on Buspar. *Defts' Ex.* 2 at ¶ 12. Buspar is an anti-anxiety medication. *Id.* at ¶ 13. Plaintiff was also prescribed Gabapentin 300 mg. twice a day for back pain. *Id.* at ¶ 26. Gabapentin is used, among other things, to treat pain. *Id.* at ¶ 24.

Plaintiff testified that he explained to Dr. Saez that he had already been on Buspar and it did not work. According to Plaintiff, Dr. Saez told him to take the Buspar for a week or two and let it build up in his system.

Plaintiff testified that he believed he was having problems with his blood pressure when he began to feel dizzy and hot. He stated he knew something was not right. On December 9, 2014, Plaintiff said he needed to talk to the doctor because he was having blood pressure issues. Plaintiff testified he also tried to get detention center personnel to call the nurse. Plaintiff testified that he and Nurse Bradley had problems.

On December 9, 2014, Dr. Saez prescribed Motrin 400 mg for seven days for Plaintiff's back pain. *Defts Ex.* 2 at ¶ 27. Plaintiff asked that his Gabapentin be increased. *Id.* at ¶ 28. On December 19, 2014, Dr. Saez ordered Plaintiff's dose of Gabapentin be increased to 600 mg twice a day for back pain. *Id.* at ¶ 29.

Plaintiff testified that on December 14, 2014, he asked what he needed to do to get his blood pressure checked. Nurse Bradley responded that she would take it when she had time. On December 15, 2014, Plaintiff submitted a grievance about his blood pressure and also stated that he had no choice but to file a § 1983 lawsuit. Doc. 88-4 at 8.

Plaintiff testified that on December 16, 2014, Nurse Bradley said she would check his blood pressure for seven days and then he could see the doctor. Plaintiff stated that Nurse

-6-

AO72A
(Rev. 8/82)

Bradley did not take his blood pressure for seven days.  Instead, she took it on December 16th, 20th, 21st, and 26th.  *Defts' Ex.* 1-n.

Plaintiff testified that his blood pressure medication was decreased but he continued having problems with his blood pressure for several months.  Plaintiff noted that he told Defendants on several occasions that he was having blood pressure problems.  *See Plff's Ex.* 2. Plaintiff testified that when he asked for his blood pressure to be checked, some of the nurses would check it and others would not.

On December 18, 2014, Dr. Saez discontinued the Latuda prescription as a result of Plaintiff's continued complaints of bad side effects.  *Defts' Ex.* 2 at ¶ 14.  The Buspar dosage was increased.  *Id.*; *see also Plff's Ex.* 1 at 15.

On December 23, 2014, Plaintiff asked to be placed on another anti-psychotic medication because of the discontinuation of the Latuda.  *Defts' Ex.* 2 at ¶ 15, On December 24, 2014, Dr. Saez prescribed Risperdal as a replacement for the Latuda.  *Id.* at ¶ 16.  Risperdal is an anti-psychotic medication.  *Id.*  On December 29, 2014, Plaintiff asked that his administration  of Risperdal be changed to bedtime.  *Id.* at ¶ 17.  Plaintiff's request was granted that same day.  *Id.* at ¶ 18.  Plaintiff continued receiving the Risperdal at bedtime until February 17, 2015, when he asked that it be discontinued.  *Id.* at 19.

Dr. Saez indicates he placed the Plaintiff on Motrin and Gabapentin for back pain rather than Hydrocodone or Tramadol because he, in his professional opinion, believed they were a better choice for the Plaintiff.  *Defts' Ex.* 2 at ¶ 30.  Plaintiff testified that Dr. Saez also said that Hydrocodone and Tramadol were not allowed at the WCDC.

AO72A
(Rev. 8/82)

On February 12, 2015, Plaintiff complained of tingling of his left arm and hand and pressure on his chest. *Plff's Ex.* 2 at 2. The nurse checked his vital signs and directed the officer to give Plaintiff one 81 mg aspirin as a precaution. *Id.* Plaintiff was directed to let them know if he started feeling worse. *Id.*

On February 23, 2015, Plaintiff was taken to the hospital due to complaints of discoloration of his left hand and feeling dizzy. He notified jail personnel via the intercom. He was taken to the nurse and, after his blood pressure was checked twice, an ambulance was called. Plaintiff testified that he believed his blood pressure was 180/108. The first responders gave the Plaintiff some nitro spray and an aspirin. Plaintiff testified that by the time they reached the hospital, his blood pressure had decreased drastically to 160/98.

The emergency room medical personnel were unable to determine the cause of Plaintiff's chest pain. Doc. 88-2 at 24. They did some tests that showed Plaintiff was not having a heart attack. Similarly, emergency room personnel were unable to determine what was causing Plaintiff's Paraesthesia. *Id.* at 23. "Paraesthesia refers to a burning or prickling sensation that is sometimes felt in the hands, arms, legs or feet. It can also occur in other parts of the body. The sensation is usually painless. It is described as tingling or numbness, skin crawling or itching." *Id.*

Plaintiff testified he experienced the same symptoms the following day. Doc. 88-3. He stated he was very anxious about his family because he had not been able to reach them and no family member had visited for several months. Nurse Madewell came down and talked to him and took his blood pressure and pulse and both were within normal limits. *Id.; Defts' Ex.* 8.

-8-

Although Plaintiff complained his fingers were blue, Nurse Madewell noted that while his fingers were cold, they were not blue. *Med. Defts' Ex.* 8.

Plaintiff testified that after he went to the hospital, Dr. Saez ordered regular checks of his blood pressure. Dr. Saez indicates that it was his belief that Plaintiff was "administered appropriate medications for all medical, psychological and psychiatric issues reported by him." *Defts' Ex.* 2 at ¶ 32. Dr. Saez asserts he was not deliberately indifferent to Plaintiff's serious medical needs and he never refused to provide medical treatment to the Plaintiff. *Id.* at ¶¶ 33-34.

With respect to his mental health issues, Plaintiff contends that the medications prescribed by Dr. Saez were not working. Plaintiff testified that every time he saw Dr. Saez, he told him that the medications were not working. Dr. Saez discontinued Latuda but then he prescribed Risperal. Plaintiff testified he could not bare the side effects of Risperal. Plaintiff states he was anxious a lot, had mild panic attacks, and was very emotional.

Plaintiff testified that the Defendants failed to properly monitor his blood pressure. As a result, Plaintiff testified he suffered from headaches, dizziness, and sensations in his hands and arms. Plaintiff indicated he had the narcotic pain medication due to pain in his back caused by degenerative joint disease. Plaintiff testified that Dr. Saez said he was not allowed to prescribe narcotic pain medications. Instead, Dr. Saez prescribed Buspar and Gabapentin, which were not effective. Plaintiff indicated he had shooting pain down his leg, muscle spasms, and pain in his lower back.

Plaintiff testified that since he was having blood pressure problems, he requested a low sodium diet. According to Plaintiff, Nurse Bradley refused his request. Just a couple weeks

before his transfer to the ADC, Plaintiff testified Lieutenant Cambron helped the Plaintiff get put on a low sodium diet.

Plaintiff also believes his privacy rights were violated.  He testified that the psychiatric nurse sometimes spoke to him in the hall.  Other inmates and jail personnel might be in the hallway at the same time.  Plaintiff testified that deputies sometimes made comments on what Plaintiff was talking to the nurse about.  Plaintiff also testified that a guard went into the examination room with him each time he was seen by medical personnel.

Plaintiff was transferred to the ADC on March 2, 2015.  Plaintiff testified that once he was at the ADC, all mental health medications were discontinued except for Paxil.  He was given Motrin and Tylenol for his degenerative joint disease.  Plaintiff testified he was also on Lisinipril, Prilosec, and a few other medications.

When he was released from the ADC, he went into transitional housing.  Plaintiff testified that when he sought treatment, he was put on the same medications as he was on when he was at Perspectives.

### III.  Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the "government's obligation to provide medical care for those whom it is punishing by incarceration.  An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  Estelle v. Gamble, 429 U.S. 97, 103 (1976)(internal quotation marks and citation omitted).  "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002)(citing Estelle, 429 U.S. at 104); see also Christian v. Wagner,

-10-

623 F.3d 608, 613 (8th Cir. 2010)("The Eighth Amendment does not apply to pretrial detainees, but the Due Process Clause of Fourteenth Amendment imposes analogous duties on jailers to care for detainees").

In order to succeed on a denial of medical care claim, an inmate must show both that he had an objectively serious medical need and that the defendant was deliberately indifferent to that need. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)(citations omitted). "A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006)(citation omitted). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992).

### (A).  Discontinuation of Controlled Substances

Plaintiff was booked in on November 5, 2014.  He indicated he had high blood pressure, was bi-polar, had post traumatic stress disorder, borderline personality disorder, panic disorder, and degenerative disc disease.  For these ailments he had current prescriptions for Lisinopril, Alprazolam, Paxil, Latuda, Abilify, Temazepam, and Hydrocodone.  He was being treated for

-11-

these diseases and/or conditions.  From the time he was booked in, until November 10, 2014, he received none of his medications.

Beginning November 10, 2014, he started receiving Latuda, Lisinopril, and Paxil.  These medications were brought to the jail by Plaintiff's family.  Jail personnel refused to accept Alprazolam, Temazepam, Hydrocodone, and Tramadol on the grounds they were narcotics. Plaintiff was given nothing for pain.

Clearly, the conditions Plaintiff had constitute serious medical needs.  Plaintiff testified that the sudden cessation of his prescribed medications caused him to suffer withdrawal symptoms including sweating, having nightmares, not eating, being confused and incoherent, and being unable to get out of his bed for a week.  Five of Plaintiff's medications had warnings against suddenly stopping them.   These medications came with the following warnings:

Alprazolam is not to be stopped or the dose decreased without talking to your doctor. If you suddenly stop taking alprazolam you may experience withdrawal symptoms such as seizures; shaking of a part of your body that you cannot control; headache; blurred vision; increased sensitivity to noise or light; change in sense of smell; sweating; difficulty falling asleep or staying asleep; difficulty concentrating; nervousness; depression; irritability; aggressive behavior; muscle twitching or cramps; diarrhea; vomiting; pain, burning, numbness, or tingling in the hands or feet; a decrease in appetite; or weight loss.[5]

Latuda, a brand name for the drug Lurasidone, contains the following warning: "Do not stop taking lurasidone without talking to your doctor."[6]

Abilify, a brand name for the drug aripiprazole, has the following warning: "You may become suicidal, especially at the beginning of your treatment and any time that your dose is increased or decreased."[7]

---

[5]https://medlineplus.gov/druginfo/meds/a684001.html (accessed November 17, 2016).

[6]https://medlineplus.gov/druginfo/meds/a611016.html (accessed November 17, 2016).

[7]https://medlineplus.gov/druginfo/meds/a603012.html (accessed November 17, 2016)

-12-

Temazepam contains the following warnings: "If your doctor has told you to take temazepam regularly, talk to your doctor before you stop taking this medication. Your doctor will probably decrease your dose gradually. If you suddenly stop taking temazepam, you may feel depressed or have more difficulty falling asleep or staying asleep, or you may experience more severe withdrawal symptoms such as uncontrollable shaking of a part of the body, stomach and muscle cramps, vomiting, sweating, and rarely, seizures."[8]

Hydrocodone comes with the following warnings: "If you have taken a hydrocodone combination product for several weeks or longer, do not stop taking the medication without talking to your doctor. If you suddenly stop taking a hydrocodone combination product, you may experience withdrawal symptoms. Your doctor will probably decrease your dose gradually."[9]

Many of the facts in this case are undisputed.  It is undisputed that the Plaintiff had valid current prescriptions for the medications.  It is undisputed that Plaintiff's medications were abruptly discontinued when he was booked in.  Although seen by a nurse the day after he was booked in, there is no suggestion that she, or anyone else on the medical staff recognized, or gave consideration to, the possibility of the Plaintiff suffering withdrawal symptoms due to the abrupt discontinuation of the various medications.  No determination was made as to whether or not it was medically safe for the Plaintiff to be taken off all medication.

It is undisputed that Southern Health Partners (SHP) contracted to provide medical care to the detention facility.  It is undisputed that Dr. Saez did not place Plaintiff on any medications before Plaintiff's family brought his medication to the jail.  *Defts' Ex.* 2.  It is undisputed that the detention center refused to accept Tramadol, Hydrocodone, Alprazolam, or Temazepam.

While Defendants indicate that SHP did not prohibit the dispensing of any medications, Plaintiff offered credible testimony that he was told by Dr. Saez that no narcotic medications

---

[8] https://medlineplus.gov/druginfo/meds/a684003.html (accessed November 17, 2016).

[9] https://medlineplus.gov/druginfo/meds/a601006.html (accessed November 17, 2016).

-13-

would be prescribed to him.  Tramadol[10] and Hydrocodone[11] are narcotic analgesics. Alprazolam[12] and Temazepam[13] are benzodiazepines which are controlled substances.  All four controlled substances were refused when Plaintiff's family brought his medications to the detention center.  Plaintiff was not prescribed any of these medications.  Although Plaintiff was seen by a nurse on November 6, 2014, nothing was done to ensure that Plaintiff was taken off these medications gradually.

I believe there are genuine issues of material fact as to whether Dr. Saez exhibited deliberate indifference to Plaintiff's serious medical needs when he failed to exercise professional judgment in determining whether these medications should be abruptly discontinued instead of gradually weaning the Plaintiff off these medications.  Further, with respect to the use of controlled substances, it appears that these were discontinued because of a policy that prohibited the use of these medications at the detention center.

The next question is whether there is a genuine issue of material fact as to Plaintiff's claims against SHP.  "[I]t is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor."  Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1214 (8th Cir. 2013).  To establish SHP's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official

---

[10] https://medlineplus.gov/druginfo/meds/a695011.html (accessed November 30, 2016).

[11] https://medlineplus.gov/druginfo/meds/a614045.html (accessed November 30, 2016).

[12] https://www.dea.gov/druginfo/drug_data_sheets/Benzodiazepines.pdf (accessed November 30, 2016).

[13] https://medlineplus.gov/druginfo/meds/a684003.html (accessed November 30, 2016).

-14-

custom, policy, or practice of the governmental entity." <u>Moyle v. Anderson</u>, 571 F.3d 814, 817

(8th Cir. 2009)(citation omitted).  The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1)
> where a particular municipal policy or custom itself violates federal law, or
> directs an employee to do so; and (2) where a facially lawful municipal policy or
> custom  was adopted with "deliberate indifference" to its known or obvious
> consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008).
> There need not be a finding that a municipal employee is liable in his or her
> individual capacity before municipal liability can attach. *Speer v. City of Wynne*,
> 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.
> 1992) ("A public entity or supervisory official may be held liable under § 1983
> even though no government individuals were personally liable."). Where an
> official policy is itself unconstitutional or directs employees to take
> unconstitutional action, no evidence beyond a statement of the policy and its
> exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn
> Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

<u>Id</u>. at 817-18.  Here, Plaintiff has alleged that SHP had an unconstitutional policy or custom of

not allowing any controlled substances to be prescribed.  I believe there is a genuine issue of

material fact as to whether an unconstitutional policy or custom existed.

### **(B).  Delay after November 10, 2014, and Changes in Prescribed Medication**

With respect to Dr. Saez's prescriptions for various medications and altering the doses

of prescribed medication, I do not believe there are genuine issues of material fact as to whether

Dr. Saez exhibited deliberate indifference to Plaintiff's serious medical needs.  The decision of

what medications to prescribe and the dosage of the same involves the exercise of professional

judgment.  <u>See e.g, Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996).

While the Plaintiff may not have seen the medical personnel as quickly as he would have

liked, he was seen on numerous occasions and medications were changed in accordance with his

condition.  <u>Logan v. Clarke</u>, 119 F.3d 647, 650 (8th Cir. 1997)("Although the prison doctors may

not have proceeded . . . as quickly as hindsight perhaps allows us to think they should have, their actions were not deliberately indifferent.  The doctors made efforts to cure the problem in a reasonable and sensible manner").  Further, Plaintiff has not pointed to any evidence of intentional delay.  Fourte v. Faulkner County, Ark., 746 F.3d 384, 390 (8th Cir. 2014).

The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record.  Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005).  This is true unless the need for medical attention is obvious to a layperson in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay.  See Schaub v. VonWald, 638 F.3d 905, 919 (8th Cir. 2011)(citing Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999)); Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995); see also Boyd v. Knox, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation"). In evaluating a treatment delay for summary judgment purposes, the court "must accept facts as recited in prisoner affidavits as true." Wise v. Lappin, 674 F.3d 939, 941 (8th Cir. 2012) (citing Tlamka v. Serrell, 244 F.3d 628, 634 (8th Cir. 2001)(taking Plaintiff's statements as true, the record revealed trial worthy issues as to a treatment delay of two months for a broken jaw when prison medical providers had a diagnosis and recommendation for a specialist referral, Plaintiff repeatedly complained of pain and difficulty due to his injury, and the jaw deformity was physically obvious)).

Here, the record establishes that there was significant interaction between the Plaintiff and various medical personnel of which the vast majority was contact with the psychiatric nurse,

-16-

Judy Madewell.  Although Nurse Madewell is not a named Defendant in this case, it is necessary

to consider her interactions with the Plaintiff in determining what medical care was given and

whether Plaintiff's medical care was delayed.

A mental health survey was completed on November 19, 2014, by Nurse Madewell.

*Defts' Ex.* A-2 at 3-4.   After completing the survey, Nurse Madewell saw the Plaintiff on the

following dates: November 24, 2014; November 25, 2014; December 4, 2014, December 8,

2014; December10, 2014; December 18, 2014; December 23, 2014; December 29, 2014;

February 4, 2015, February 17, 2015, and February 24, 2015.  *Defts' Ex.* A-2 at 88-3 at 11-15.

Plaintiff was seen on November 6, 2014, and an evaluation form completed.  Plaintiff

was seen on November 29, 2014, and a SHP admission data/history and physical form was

completed.  *Id.* at 5.  On January 30, 2015, a depression questionnaire was completed.  *Id.* at 9-

10.  Plaintiff was also sent to the hospital on two occasions: the first time for back pain on

November 5, 2014; the second time for chest pain on February 23, 2015.  *Defts' Ex.* A-1 at 22-

25.

Plaintiff has not provided verifying medical evidence to show that the delay in his being

treated for any of his ailments caused any detrimental effect.[14] Nor may any such effect be

inferred from the facts or allegations in the record.

With respect to Nurse Lee, Plaintiff's claim is based on:  her alleged failure to obtain his

medical records in a timely manner; and her threat to punish him if he refused to eat certain food

that he viewed as harmful to him.  There is no evidence that Nurse Lee's lack of diligence in

---

[14]The initial five day period of delay is addressed separately, supra.

-17-

obtaining Plaintiff's medical records resulted in any delay in his receiving medical treatment. Similarly, there is nothing in the record to suggest Nurse Lee had any authority to punish the Plaintiff or that she was involved in anyway with the decision of which foods were served. Nurse Lee is entitled to summary judgment in her favor.

With respect to Nurse Bradley, the Plaintiff testified she denied his request for a low sodium diet and failed to take his blood pressure frequently enough. These facts are insufficient to show a genuine issue of material fact as to whether Nurse Bradley exhibited deliberate indifference to Plaintiff's serious medical needs.

### (C).  Privacy Issue

Plaintiff testified that his rights to privacy with respect to his confidential medical information were violated when he was spoken to in the hallway by Nurse Madewell and when an officer was present during visits with medical personnel.  However, this policy was one adopted by the detention center.  Doc. 88-1 at ¶ 11.  No evidence was presented suggesting the medical personnel were allowed to vary from this policy.  With respect to Nurse Madewell choosing to speak with Plaintiff in the hallway instead of a more private place, she is not a named Defendant.

### IV.  Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 83) **be granted in part and denied in part**.  I recommend that the motion be granted with respect to all claims against Nurse Rhonda Bradley and Nurse Teresa Lee, and all claims about delays in medical care or changes in medication, be dismissed with prejudice.  This leaves for

-18-

AO72A
(Rev. 8/82)

later resolution the claims against SHP and Dr. Saez based on the discontinuation of the controlled substances and the failure to ensure that incoming prisoners who are currently on medication continue on those medications until the prisoner can be evaluated and an opinion formed as to whether other medications would do a better job or should be discontinued.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of January 2017.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-19-